Lauren A. Dean, Esq. (SBN 174722)
**MAGNANIMO DEAN LAW, APC**
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel: (818) 305-3450
Email: lauren@magdeanlaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZSATA WILLIAMS-SPINKS, Derivatively on Behalf of LUCID GROUP, INC. (F/K/A CHURCHILL CAPITAL CORP IV), | Case No.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| PETER RAWLINSON, GLENN AUGUST, ANDREW LIVERIS, and TONY POSAWATZ, | |
| Defendants, | |
| -and- | |
| LUCID GROUP, INC. (F/K/A CHURCHILL CAPITAL CORP IV, | |
| Nominal Defendant. | |

Plaintiff, by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Lucid Group, Inc. (f/k/a Churchill Capital Corp IV) ("Lucid" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own

acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Lucid with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Lucid against Defendant Glenn August ("August"), for breaches of his fiduciary duties as a director of Lucid, abuse of control, gross mismanagement, and waste of corporate assets, against Peter Rawlinson ("Rawlinson"), Andrew Liveris ("Liveris"), and Tony Posawatz ("Posawatz") (collectively, the "Atieva Defendants," and together with August, the "Individual Defendants") for aiding and abetting Defendant August's breaches of their fiduciary duties as a director of Churchill Capital Corporation IV ("Churchill" or "CCIV"), against the Individual Defendants for unjust enrichment, and against Defendant Rawlinson for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Lucid was an electric vehicle manufacturing company that sought to initially compete with luxury car manufacturers.  Lucid has nearly no revenue and invested heavily in the development of its initial vehicle, the Lucid Air ("Air").

3.      On September 9, 2020, the Company revealed the Air, stating that it is the "World's Most Powerful and Efficient Luxury Electric Sedan" and announcing its models would cost between $69,900-$169,000.

4.      Despite its promising potential, the Company was running out of cash.  The Company took a net loss of $1.3 billion in 2020.

5.      On January 11, 2021, Bloomberg News announced that Churchill and Lucid were in talks about a potential Merger (the "Bloomberg Article").  Churchill was a Special Purpose Acquisition Company ("SPAC"), created to raise a significant sum of

cash through an initial public offering ("IPO") of Churchill securities, and then acquire a privately held company, essentially taking that company public.

6.    Upon the publication of the Bloomberg Article, Churchill's stock price increased 32%, which indicated Churchill investors felt the proposed acquisition of Lucid would be beneficial to Churchill.  However, as the Merger documents would show, discussions between Churchill and Lucid on January 11, 2021, progressing rapidly after the publication of the Bloomberg Article.

7.    Over the following weeks, as Lucid and Churchill negotiated a potential deal, investors became confident that discussions were ongoing and there was a likelihood that Churchill would acquire Lucid.  In fact, Churchill's CEO confirmed this fact through a statement — *i.e.*, that he was in a "difficult position," when asked to comment on the negotiations, which indicated such negotiations were occurring — and journalists quickly noted that Lucid posted job openings for roles only needed by a publicly traded company, indicating Lucid was planning to become public through the Merger.

8.    On January 22, 2021, The Los Angeles Times reported that a deal was "near completion" citing unnamed sources, and on February 3, 2021, The Wall Street Journal wrote that discussions were "continuing," citing unnamed sources.

9.    Numerous articles were published about the Company's prospects—as a reason to invest in Churchill.   For instance, on January 14, 2021 the Motley Fool reported: "This SPAC Could be the Next Tesla".   Motley Fool reported how the Company's promising prospects made it a desirable target and noting that "Lucid is on the cusp of starting deliveries" as a key fact making investment attractive.

A.    **The Scheme**

10.    On February 5, 2021, Defendant Rawlinson appeared on CNBC's television show Squawk on the Street.  During the interview, Defendant Rawlinson falsely claimed that the Company expected to produce "6,000-7,000 units" of the Air in 2021.  This

indicated that the Company was close to launching the car and would earn at least $420 million in revenue in just 2021.  Defendant Rawlinson also claimed that Lucid had "already built our first phase of our factory in Arizona, which is good for 34,000 units." This was false.

11.     As explained below, the reference to an automotive factory being "built" and "fully commissioned" has a well understood meaning in the industry, consistent with the ordinary meaning of Defendant Rawlinson's statement in context, and indicates the facility has met industry requirements, is prepared and validated to manufacture a particular vehicle and is prepared for SOP.  The factory could not be "built" and "good for 34,000 units," unless Air's design was completed and tested and ready for SOP. That Defendant Rawlinson's statements carried this ordinary meaning was reinforced by a graphic displayed along with Defendant Rawlinson's spoken comments, claiming the factory was "already built" and "fully commissioned."

12.     As a result of this statement, Churchill's stock price increased, rising 14.66% from the prior day's closing price.  News coverage of the stock move focused on Defendant Rawlinson's Squawk Interview.  For example, on February 5, 2021, Investor Place reported that the increase in stock price followed Defendant Rawlinson's interview where he stated "the Arizona factory is now built and operational, with a current capacity of 34,000 vehicles" and Motley Fool attributed the rally to Defendant Rawlinson's "bullish" statements that the Company had "completed" phase one of the factory.

13.     The scheme continued on February 12, 2021, when CNBC issued a video of Defendant Rawlinson claiming: "right behind me we're doing the pre-production run – the release candidates for Lucid Air Dream Edition, which we're launching this year, this Spring."  The supposed fact that Lucid was planning SOP for the Air in Spring 2021, was very significant as it indicated how far along the Company was in its development and manufacturing process, and because it indicated the Company would

soon be earning revenue.   Again, the market reacted to these disclosures, with Churchill's stock increasing 26.67%.

14.     The above false statements, which artificially increased the price of Churchill securities, gave Defendant Rawlinson a greater negotiating leverage in the Merger.   By making Lucid appear to be a more attractive Merger target, Defendant Rawlinson drove up the price of Churchill's stock.   As the <u>Motley Fool</u> would write, the rise in Churchill's stock price gave the Company "the upper hand in negotiations[.]"

**B.     The Truth Regarding Lucid**

15.     Interviews with former Company employees ("Confidential Witnesses" or "CWs")[1] have revealed the situation within the Company at the time of Defendant Rawlinson's statements.

16.     Several CWs confirmed that, at the time of Defendant Rawlinson's statements, the actual Company-wide Lucid SOP schedule had been pushed past the Spring 2021 date Defendant Rawlinson was promoting, and CW-1 explained that it was actually set for October 2021, and that he and his colleagues laughed when Defendant Rawlinson touted a rollout of 6,000 vehicles the first half of 2021 to the media because "we were just in a meeting where we said we couldn't go into production."

17.     Further, several CWs conveyed that there was broad consensus within the Company that a Spring 2021 SOP would be impossible.   For instance, CW-4 stated that everyone knew it was impossible, and that "the car wasn't ready.   It wasn't even close." CW-1 recounted the entire work force knew that the company would not meet their production goals as touted by Defendant Rawlinson in media appearances.

18.     The fact that a Spring 2021 SOP was off the table was well known to Defendant Rawlinson and to the Company's senior leadership.   For instance, CW-4

---

[1]     All CWs are taken from the securities class action entitled *In re CCIV/LUCID Securities Litig.*, Case No. 4:21-cv-09323-YGR (N.D. Cal.) and are alleged herein upon information and belief.

explained that information was relayed to top leadership during meetings, in reports, and on projection charts that demonstrated it could not be done by a Spring SOP and that "supplier projections, tooling projections, software projection – none of that would line up" with hitting a Spring SOP. When asked if this timeline was communicated to Defendant Rawlinson, CW-4 responded, "oh god yeah. He knew what was going on."

19.     CW-4 also stated that he was on calls where Defendant Rawlinson was told that a Spring 2021 SOP would not be possible and that CW-4 was in meetings where senior Company employees told Defendant Rawlinson that the Company would not meet a Spring 2021 SOP. Several CWs recounted widely attended video meetings where the delays that would make a Spring SOP impossible were openly discussed.

20.     Several CWs also recounted many reasons why a Spring 2021 SOP would not be possible. Many of these obstacles to production directly indicated that the factory was far from fully built and that aspects of the Air were not even designed, meaning that the factory could not be prepared for SOP as Defendant Rawlinson's public statements had indicated. A few of those obstacles were:

•       The Air's two most critical components – the electric motor and the battery – were unfinished and many months away from being production-ready at the time of the statements. CWs reported that design changes were ongoing that (i) the Company had not even decided what battery or electric motor to use; (ii) the battery had not yet been validated; (iii) the development of the Beta models of the electric motor were not complete until sometime from mid-March to April 2021; and (iv) a production-ready version of the electric motor was not ready until July 2021.

•       Testing to secure the legally required "Monroney label" was not scheduled for completion until the end of June 2021; that is, the SOP could not begin until July 2021 at the earliest.

•       Basic elements of the Air's design and construction were not complete,

such as the mechanism for how the doors opened, and the Beta version's lack of basic elements, such as real interiors and doors.

- The heavily marketed vehicle safety system — the Advanced Driver Alert System ("ADAS") — had unresolved issues that did not meet safety regulations, such as lacking a functional reverse camera, which would not be finished until August 2021.

- Aspects of the heavily marketed technology within the car, such as the "infotainment system," were many months off from production-ready in early 2021.

- The factory lacked basic functions, such as an inventory tracking system, was not fully staffed, and months earlier the Company had been "kicked out" of the factory by the local fire marshal for failing to comply with fire safety regulations.  According to CW-5, as recently as mid-December, 50% of the equipment was incomplete, equipment and robots were missing; large factory doors were not operational; roller machines used to align cars were not operational; testing equipment was not on hand; conveyors were not installed; machines used to install fluids were unavailable; dynamometers were not operational; Automatic Guided Vehicle ("AGV") systems were not operational; air lines and other piping was not installed; and the bathrooms were not yet built.

- Beta vehicles were still being built by hand in February and March 2021, indicating the factory was not yet capable of SOP, and the Beta vehicles were not built to specification, of terrible quality, and had faulty components.

**C.    The Truth Emerges**

21.    On February 22, 2021, the Company announced that Churchill had agreed to acquire Lucid.  However, at the same time, the Company also issued a slide deck for an upcoming investor presentation (the "Investor Presentation"), which showed that — far from producing 6,000-7,000 Airs in 2021 — Lucid would only manufacture a measly

577 Airs that year.   Even with conservative estimates, this amounted to $380 million decrease in 2021 revenue.  The slide deck also showed that the Company would not meet the publicly touted Spring 2021 SOP and would begin production sometime in the second half of 2021.  That production would be delayed revealed that the factory was not "already built" as the Company would need months before production could begin.

22.     The timing of these revelations further demonstrated that the prior representations were false and misleading.

23.     When Defendant Rawlinson delivered the Investor Presentation, on February 23, 2021, he attributed the delay to a need to improve quality.  This meant that the factory could not have been complete, since it could not have been built to manufacture a vehicle to specification if that vehicle's engineering design was still not finalized.  Also, in an interview that same day, Defendant Rawlinson admitted that the Company needed to "humbly" work and "diligently execute" in order to get the car "into production," which contrasted sharply with the prior message that the factory was ready for SOP.

24.     On this news, the market price for Churchill securities dropped by 38.63% from a price of $57.37 on the close of trading on February 22, 2021, to a price of $35.21 on the close of trading on February 23, 2021.  As the market continued to digest the many disclosures, Churchill's stock price fell another 18.49% on February 24, 2021, to close at $28.70.  This decline wiped out $7.4 billion in Churchill's market cap, as investors realized the SPAC would be acquiring a far riskier and less valuable company.

25.     Following these revelations, the Company has continued to struggle to manufacture cars, and it appears doubtful it will meet even its revised estimate of 577 cars for 2021.  The Company also needs to raise additional capital as it continues to work to actually become production-ready.

26.     On December 6, 2021, the Company disclosed that the SEC has launched an investigation, which the Company acknowledged "appears to concern the business

combination between [Churchill and Lucid] and certain projections and statements."

27.     While Defendant Rawlinson's manipulation of Churchill's stock cost investors billions, it secured him a lucrative Merger with Churchill.  The Merger benefited Defendant Rawlinson by: (i) providing the Company with desperately needed capital, thereby protecting Defendant Rawlinson's position as CEO; (ii) elevating his status to CEO of a publicly traded company, wherein average CEO compensation for similarly sized firms is 22 times Defendant Rawlinson's pre-Merger compensation; (iii) earning Defendant Rawlinson an incredible increase in the value and liquidity of his equity (including options) in the Company, which is now valued at more than $1.1 billion; and (iv) earning him a direct special equity bonus for his "efforts" on the Merger.

## JURISDICTION

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

## THE PARTIES

**Plaintiff**

32.   ***Plaintiff Zsata Williams-Spinks*** is, and was at relevant times, a shareholder of Lucid.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff currently holds Lucid shares as of the filing of this Complaint.

**Nominal Defendant**

33.   ***Nominal Defendant*** is a Delaware corporation with its principal executive offices at 7373 Gateway Boulevard, Newark, California 94560.  The Company's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "LCID."

34.   Lucid, in its current form, results from a July 2021 merger (the "Merger") between Atieva, Inc. d/b/a Lucid Motors ("Atieva"), a start-up electric vehicle manufacturer, and Churchill, a special purpose acquisition company ("SPAC").

35.   Atieva, an exempted company incorporated with limited liability under the laws of the Cayman Islands, was founded in 2007.  Churchill was incorporated in Delaware in 2020 for the purpose of raising capital through an initial public offering ("IPO") and effectuating a merger or similar business combination with an existing operating company.  Churchill consummated its IPO on August 3, 2020.

36.   Pursuant to the Merger in July 2021, Atieva merged with a subsidiary of Churchill, surviving the Merger and becoming a wholly-owned subsidiary of Churchill.

**Defendant Directors**

37.   ***Defendant Peter Rawlinson*** ("Rawlinson") served as Chief Executive Officer ("CEO") and Chief Technology Officer ("CTO") of Atieva from April 2019 until the Merger, after which he continued in those roles at Lucid.  Defendant Rawlinson currently serves as a member of the Executive Committee.

38.   ***Defendant Glenn R. August*** ("August") is the Founder, CEO and a director of the Company.  Defendant August also serves as global head of the Company's distressed investment activities.  Defendant August chairs or serves on various firm

committees, including the partnership, investment strategy and several fund investment committees.

39.     ***Defendant Andrew Liveris*** ("Liveris") served as a director and Chairman of Atieva throughout the Relevant Period and until the Merger, after which he has served in those roles at Lucid.   Defendant Liveris is currently Chair of the Compensation Committee and the Executive Committee at the Company.   Further, Defendant Liveris served as an Operating Partner at Churchill, providing a crucial link between Churchill and Atieva.

40.     ***Defendant Tony Posawatz*** ("Posawatz") served as a member of Atieva's board of directors from April 2019 until the Merger, after which he has served as a member of the Company's Board.   Defendant Posawatz is currently a member of the Compensation Committee and the Executive Committee.

41.     Defendants Rawlinson, August, Liveris and Posawatz are collectively referred to hereinafter as the "Individual Defendants."

## CODE OF BUSINESS CONDUCT AND ETHICS

42.     As members of the Board, the Individual Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

43.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lucid, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Lucid, the

Individual Defendants owed Lucid and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Individual Defendants to use their utmost abilities to control and manage Lucid in an honest and lawful manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lucid and its investors.

45. Each director of the Company owes to Lucid and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

46. To discharge their duties, the officers and directors of Lucid were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Lucid were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate

statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Lucid conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

47.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lucid, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

48.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, Lucid has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

A.     **Background On The Company**

49.    Lucid, formerly known as Atieva, is a U.S. electric automobile manufacturer headquartered in Newark, California.  The Company was founded in 2007, then-focused on developing electric car battery technology.  The Company soon shifted its focus to producing electric cars.  As part of that shift, the Company brought in Defendant Rawlinson from Tesla in 2013, to join Lucid as CTO.  Defendant Rawlinson was later elevated to CEO in 2019.

50.    In late 2016, the Company announced that it would undergo construction to build a $700 million manufacturing plant in Casa Grande, Arizona, where it planned to build the Company's first vehicle, a luxury performance sedan, competing with the likes of Tesla and Mercedes Benz.

51.    In order to construct both the factory and the car, the Company would require significant capital investment.  The Company's next major step in fundraising was in September 2018, when it announced that it had executed an investment agreement with the PIF of Saudi Arabia for over $1 billion, which the Company claimed would provide it with the necessary funding to commercially launch its first electric vehicle.

52.    On September 9, 2020, Lucid unveiled its first car (the Air), dubbing it as the "World's Most Powerful and Efficient Luxury Electric Sedan," and also announced that various models of the car would be sold for between $69,900-$169,000.

53.    The Company promoted the Air as a sedan with features evidencing the highest level of design, technology, and luxury.  During the Air's launch event, Defendant Rawlinson consistently referenced the Company's intention to produce all technology, including both software and hardware, in-house.

54.    The Lucid Air was marketed as having cutting-edge mechanical components.  The Company affirmed that all of the vehicle's performance components were developed internally.  For instance, the drivetrain, which refers to the mechanical framework operating the wheels of the car, was designed by the Company to be far more

compact than that of other vehicles.  As an electric vehicle ("EV"), the Air employed a battery pack and electric motor, rather than an Internal Combustion Engine ("ICE"). The Company consistently highlighted that its battery was uniquely compact and efficient, while crucially maintaining a best-in-industry range.  The Lucid-designed battery was said to be capable of achieving four miles per kilowatt hour of electricity, had proprietary technology solutions to extremely complex engineering issues, such as the thermal systems required to maintain the battery life, and boasted the fastest charging rate among its competitors.  Further, the battery utilized a 900V architecture that set it apart from competitors, like Tesla.

55.    When the Air was unveiled, Defendant Rawlinson promoted the electrical motor that Lucid had supposedly developed for the vehicle.  That is, each motor produced six hundred horsepower, and the Air was designed to fit up to three of the Company's powerful, compact, and ultra-efficient permanent magnet electric motors.

56.    The Company stated that the Air's one-of-a-kind battery, electric motor, and mechanical systems would allow drivers to travel an estimated EPA range of 400 to 500 miles on a single charge.  Further, the Lucid Air would be capable of reaching speeds of over 200 miles per hour.  The Company also stated that the Lucid Air (Dream Edition) would accelerate from 0 to 60 miles per hour in only 2.5 seconds, roughly the same performance as the Porsche 911 Turbo S.  Because the Lucid Air is intended to operate as a high-performance luxury sedan, the Company also highlighted the vehicle's comprehensive air springs and damper technology that would allow for superior handling and road performance.

57.    Further, the Air was said to offer numerous software and sophisticated technological features.  The dashboard and center console were designed to be completely digitized, with one continuous screen for the dashboard and a proprietary tablet embedded into the center console.  Moreover, the Company's website indicated that this vehicle would be equipped with a voice-based digital assistant that would

develop a comprehensive profile of the driver to anticipate their driving preferences.

58.     The exterior of the vehicle would consist of a glass canopy covering the entirety of the cabin.  The Company stated that the rear of the car would consist of a single taillight, designed as one line.  Instead of solely providing drivers with a traditional rear trunk, the Company created two trunk spaces, a rear trunk, and a front trunk, or "frunk," which it said was the largest ever designed, providing total storage comparable to an SUV.  The Company also claimed that the exterior design was aerodynamic and that the Air would rank as one of the most aero-efficient vehicles on the market.

**B.     Background On Churchill**

59.     Churchill was a SPAC formed as a corporation in Delaware in April 2020. In July 2020, Churchill completed its IPO, generating around $2 billion in capital, through issuing 207 million shares of new stock at a price of $10.00 to public investors. Churchill was created by M. Klein, of which Michael Klein is the founder. Michael Klein served as the CEO, Chairman of the board of directors and director (Principal Executive Officer) of Churchill.

60.     SPACs, also known as "blank check" companies, are publicly traded shell companies created for the purpose of merging with privately held businesses.  Once a SPAC identifies a target and agrees to terms, the parties effect a business combination through a reverse merger.

61.     This transaction structure allows the target, a privately held company, to become publicly traded by merging with the SPAC (or a subsidiary of the SPAC).  This allows the target to bypass the traditional IPO process while allowing their equity to become publicly traded in an expedited manner without much of the traditional regulatory scrutiny.  For these reasons, SPACs are now a dominant route to taking businesses public, presently representing nearly 70% of total US IPO fundraising.

62.     M. Klein, the creator of Churchill, is one of the world's most prolific SPAC

founders, having launched seven such entities and raised billions of dollars since September 2018 under the "Churchill" banner.

63.     Most SPACs typically have the same basic structure.  A SPAC raises funds from public investors through an IPO, and then holds those funds in "trust" for those investors, while the SPAC seeks an acquisition target. The SPAC will then have a "completion window"—generally two years—to identify and execute a business combination.  If the SPAC fails to do so during the completion window, then it must return the funds in trust to its public stockholders, and then the SPAC dissolves.  Also, in a typical SPAC, founders receive, for a nominal price, "founder shares," amounting to a substantial portion of the SPAC's total equity.  As Andrew Ross Sorkin of <u>The New York Times</u> wrote: "This is not pay for performance. It is pay before performance." Once the SPAC finds a business combination to effectively take a company public, these founder shares convert into regular, common stock of the post-Merger company, which is often valued at significantly higher than the nominal amount that the founders paid, but also higher than the IPO price. Thus, the SPAC founders are incentivized to complete a business combination.

64.     On May 22, 2020, Churchill's sponsor, Churchill Sponsor IV LLC, purchased 21,562,500 shares of the Company's Class B common stock for an aggregate price of $25,000 (*i.e.*, "founder shares.").  On several later occasions, Churchill effected stock dividends of shares of Class B common stock for each outstanding share of Class B common stock, bringing the total Class B common stock held by Churchill Sponsor IV LLC to 51,750,000, equaling 20% of the Company's issued and outstanding shares after the IPO.  With few exceptions that allow for sooner release, the founder shares are locked up until one year after the completion of a business combination, which occurred on the July 23, 2021 ("Closing Date").

65.     The founder shares were deemed to be indirectly owned by Michael Klein. Thus, the founder shares created enormous wealth for Michael Klein—for just a $25,000

investment, he received 51,750,000 shares of Churchill stock, which would be worth $517.5 million after the SPAC's IPO (at a $10.00/share value)—and would be worth over 6 times that amount during the Company's trading high of around $65 per share. Once the founder shares are released from their lock up, Michael Klein could turn his $25,000 initial investment into billions of dollars.

## SUBSTANTIVE ALLEGATIONS

### A.    The Planned Merger Between Churchill And The Company

66.    On January 11, 2021, Bloomberg News published an article (the "Bloomberg Article") explaining that "Lucid Motors Inc. is in talks to go public through a merger with one of Michael Klein's special purpose acquisition companies, according to people familiar with the matter."  The article stated that Churchill was the entity in talks to acquire Lucid and that, according to Bloomberg News' sources, the transaction could be valued at $15 billion.  By the close of trading, Churchill's stock price increased approximately 32% to $13.20 per share.  This massive stock increase indicated to Churchill that its investors had a highly favorable view of the potential merger with the Company.

67.    The news reported by the Bloomberg Article was widely circulated in the financial press.  For instance: (1) On January 11, 2021, Seeking Alpha wrote that "CCIV . . . skyrockets on reports that electric vehicle startup Lucid Motors . . . is planning to go public in a SPAC deal with the company;" (ii) On January 11, 2021, Reuters recirculated the news from the Bloomberg Article stating that "Lucid is working with financial advisers on the deal, which could be valued at up to $15 billion;" (iii) On January 12, 2021, The New York Times reported on the Bloomberg News story, writing that Lucid "is said to be in talks to merge with a SPAC led by the financier Michael Klein;" (iv) On January 12, 2021, NASDAQ's StockMarket.com, published an article attributing the large increase in Churchill's stock price to the news of a potential Merger with Lucid; (v) On January 12,  2021, the Motley Fool wrote that Churchill was trading higher on

the Bloomberg report of the potential Merger; (vi) On January 12, 2021, <u>Business Insider</u> published an article with the headline "Churchill Capital Corp IV extends 2-day surge to over 50% on news of plans to take Lucid Motors public via SPAC."

68.    According to Merger documents, Merger talks had actually not begun at the time of the initial <u>Bloomberg News</u> article.  However, "subsequently" to the publication of that article, such discussions commenced.  In fact, the very same day the article was published, Lucid and Churchill's Chairman (Michael Klein) had a "telephone call during which they discussed the possibility of a business combination."  Thus, the Merger was apparently borne from media-generated pressure on Churchill to consider acquiring Lucid, and from this point forward, Defendant Rawlinson fully understood that he could control, or at least heavily influence, Churchill's behavior through media coverage of Lucid and the potential Merger.

69.    On January 12, 2021, Churchill signed a non-disclosure agreement "in connection with a potential business combination."  The next day, January 13, 2021, Churchill began conducting formal diligence on Lucid, and the day after that, Churchill sent a letter of intent to Lucid regarding a potential acquisition.  Over the following weeks negotiation continued with Churchill and Lucid exchanging communications about deal terms.

70.    While Churchill and Lucid negotiated the merger, additional information was revealed providing investors greater confidence that a merger would ultimately be announced.

71.    Investors had confidence in the possibility of the merger between Churchill and Lucid because of the strong ties between the two companies.  Andrew Liveris was the Chairman of Lucid's Board, and also was an operating partner of Churchill Sponsor IV LLC, the entity that served as the sponsor for Churchill, and Liveris held a substantial position in Churchill securities. Further, Churchill's CEO (Michael Klein) was regarded as "an important adviser to the Public Investment Fund," which was the Company's

largest investor.

72.     On January 11, 2021, investors noticed a significant change to the Pitch Book account for Lucid Motors.  Pitch Book is a website that tracks, among other things, merger and acquisition ("M&A") and capital markets activity of companies.  It employs professional researchers and works with companies directly to source the information on its website.  The page for Lucid was changed to state that its most recent activity was an upcoming "reverse merger" – a generic term for the type of acquisition that would occur if Lucid was taken public by a SPAC, like Churchill.  More specifically, the page listed the deal's status as "in-progress merger with Churchill Capital Corp. IV," at an expected valuation of $15 billion.

73.     On January 12, 2021, Michael Klein participated in a "Fireside Chat" with John Jannanore from the publication IPO Edge.  Mr. Jannanore started the interview, stating: "I have to address an elephant in the room, I have received emails from no fewer than 50 or 60 of you asking about a specific news report from Bloomberg yesterday, I just spoke to Michael and unfortunately he is in a difficult position and cannot address that at all."  As a "no comment" message, this utterly failed.  If the rumors were false, Klein obviously could address them and the only reason he would have been in a "difficult position," is a concern about commenting on negotiations that were in fact ongoing.

74.     On January 19, 2021, the Silicon Valley Business Journal issued an article noting: "[n]ew job postings last week by Lucid for positions that only a public company would need" contributed to the public's belief that a deal was "imminent."  The article noted that Lucid was seeking to hire an "SEC reporting manager, a director of investor relations and an analyst for investor relations."

75.     On January 22, 2021, The Los Angeles Times issued an article about the upcoming merger, stating that a deal "is near completion, according to a source familiar with the negotiations."

76.    On January 28, 2021, investors noticed events on Twitter that further evidenced Lucid was in merger talks with Churchill.  Lucid's official Twitter account responded to a tweet, by an unaffiliated individual, mentioning "CCCIIIVVV" by stating "Reservations are open at Lucidmotors.com."  Realizing that this signaled that Lucid was relating Churchill to the company, and thereby accurately endorsing the market's belief that a merger was forthcoming, the Company promptly deleted this tweet.  This led one Twitter user to comment, "If you deleted the tweet . . . we know its official . . . we caught you."  The Company did not provide any alternative explanation for the deleted tweet, cementing the market's interpretation of its original message as an endorsement of the ongoing Merger negotiations.

77.    On February 3, 2021, The Wall Street Journal also wrote about the merger, stating that "talks between the two companies are continuing," and citing "people familiar with the matter." This was now the third highly reputable publication (along with the Bloomberg Article and the Los Angeles Times), independently citing sources confirming that the merger talks were ongoing.

78.    In light of the market's expectation that a deal between Churchill and Lucid was imminent, investor publications wrote about Lucid's prospects as relevant to investing in Churchill securities.  For example:

(a)    On January 14, 2021, the Motley Fool wrote an article entitled "This SPAC Could be the Next Tesla" that detailed information about the Company's operations, explaining how Lucid's promising prospects made it a desirable target and specifically noting that "Lucid is on the cusp of starting deliveries" as a key fact making investment attractive.

(b)    On January 18, 2021, an article was published on Seeking Alpha focused on the "company behind the excitement," analyzing why Lucid's strong prospects made buying Churchill the "best available" investment in an EV startup.

(c)     On January 25, 2021, <u>Markets Insider</u> wrote that if the merger went forward it would provide the Company with "a hefty amount of cash from the SPAC to fund its operations," and that investors were "jumping at the chance to buy" an "EV darling that can compete with Tesla."

**B.     Defendants Inflate the Price of Churchill Securities**

79.     Defendant Rawlinson had seen that he could advance negotiations with Churchill through media coverage of Lucid – as the merger negotiations themselves apparently began on the heels of the <u>Bloomberg Article</u>.  Defendant Rawlinson chose to appear on CNBC's Squawk on the Street to discuss Lucid on February 5, 2021 (the "Squawk Interview").

80.     Defendant Rawlinson's decision to appear for the Squawk Interview was notable given the nature of that program and its primary audience.  Defendant Rawlinson's appearance can most obviously be understood as an attempt to communicate with investors, and because Lucid was not yet publicly traded, it was clearly an attempt to communicate to Churchill investors about Lucid, given the pending merger negotiations between Churchill and Lucid.

81.     During the Squawk Interview, Defendant Rawlinson advanced two interrelated deceits.

82.     **First**, CNBC's David Faber asked Rawlinson about Lucid's 2021 production expectations for the Air, with the question: "You expect to produce 6,000 to 7,000 units this year. Is that correct?" Defendant Rawlinson responded: "That's absolutely right." Notably, the Air's luxury price tag – reaching as high as $169,000 – meant that selling 6,000-7,000 cars would generate a significant amount of revenue for the nascent company.  Even at the lowest end of the prices Lucid was marketing for the Air – $69,900 – the sale of 7,000 cars would generate $420 million in revenue.

83.     **Second**, while still talking about the Air, Defendant Rawlinson volunteered that: "we've already built our first phase of our factory in Arizona, which is good for

1   34,000 units."   Defendant Rawlinson went on to explain that the factory would

2   ultimately have four phases of construction and that at the last stage ("stage four"), the

3   factory would be good for 400,000 vehicles per year, further evidencing that the 34,000

4   figure was supposedly the current capability of the factory, which was "already built."

5       84.    Just before (and during) Defendant Rawlinson's statements, CNBC

6   displayed a graphic.  The fact that the graphic was shown before the statements, makes

7   clear that the information in those graphics originated from Defendant Rawlinson – *i.e.*,

8   they were not merely a CNBC production staff member's summary of Rawlinson's

9   statements after the fact.  That Defendant Rawlinson had provided this information

10  ahead of time, makes it even more clear that Defendant Rawlinson's statements were

11  deliberate and pre-meditated. The graphic was as follows:



24      85.    This graphic represented that the Company's Arizona factory was "already

25  built."   Further, the graph stated that the factory was "fully commissioned."   The

26  reference to an automotive manufacturing facility being "already built" has a meaning to

27  those that follow the automotive industry.  It means that the factory is at a point where

28  the manufacturer could initiate SOP and the reference to the factory being "fully

commissioned" further confirms that Defendant Rawlinson was using the term "already built" in that ordinarily recognized way.

86.     The phrases "now built," "good for 34,000 units," and "fully commissioned" were indicators of the Company's value and prospects.  First, these statements added credibility that Lucid would produce 6,000-7,000 cars in 2021, as it was claiming.  Second, the statements showed that the Company had a valuable corporate asset – a fully functioning factory.  Third, the statements meant that the Company was one step closer to shifting focus on the next "phases" of its buildout, which would allow it to reach even larger annual production targets on schedule.  Fourth, the statements meant that the Company had proven its ability to manage the complex task of developing the Casa Grande factory, an important marker to anyone assessing the Company's future ability to meet major logistical challenges.  Fifth, the statements meant that the Air was itself fully developed and ready for SOP, because the factory could not be considered "already built" and "fully commissioned" unless the factory was built to specification and validated to construct every component and system of that vehicle.

87.     After the CNBC Squawk Interview, the Company's official Twitter account tweeted out a link to a video of the full interview and did not correct any of the false statements.

88.     On February 5, 2021, Churchill's stock opened at $30.90, and after the Squawk Interview, it closed at $34.65, for a daily increase of 12.13%.

89.     On February 12, 2021, CNBC published a video in an article entitled "First look inside Lucid Motors' new factory in Casa Grande, Arizona."  The article stated that "The company expects to deliver its first vehicle, the Air Dream Edition, this spring."  In the associated video, Defendant Rawlinson stated: "Here we are in North America's first purpose built EV factory, and right behind me we're doing the pre-production run – the release candidates for Lucid Air Dream Edition, which we're launching this year, this

Spring."

90.    On February 11, 2021, Churchill had a closing price of $31.50, and after Defendant Rawlinson's statements and on February 12, 2021, Churchill closed up 26.92%, at a price of $39.98.

C.    **The Undisclosed Truth About The Company's Production Capabilities**

91.    While Defendant Rawlinson appeared for the February 4, 2021, Squawk Interview, asserting that the Company's Arizona factory was "already built" and confirming that the Company would produce 6,000-7,000 cars in 2021, the Company's true production capabilities were in poor shape.  The factory was not yet functional, the Air itself was not yet fully designed, and the Company was facing production delays that had already caused it to move its production start date from Spring of 2021 to October 2021.  In addition to misrepresenting the present condition of the factory, these delays to the production start date meant that Lucid had already abandoned its supposed plans to produce 6,000 cars in 2021, and the lack of readiness was a massive undisclosed risk that made the representation that Lucid was going to make 6,000 cars in the year, exceptionally misleading.

92.    CW-1 worked as a Logistics Operations Supervisor at the Company from July 2020 until December 2020. CW-1 was responsible for supervising a logistics operations team at the Company's Arizona plant.  CW-1 reported to Operations Manager David Tasker and Senior Logistics Manager Craig Watson.  Messrs. Tasker and Watson reported to Vice President of Global Supply Chain Peter Hasenkamp, and Hasenkamp reported to Defendant CEO Peter Rawlinson.  CW-1 worked primarily out of the Casa Grande location and the Company's Tempe, AZ facility.  More specifically, CW-1 primarily worked out of the Casa Grande location during the final two months of his tenure. CW-1 explained that as Logistics Operation Supervisor, he was responsible for overseeing the delivery and distribution of vehicle parts and construction materials.

93.    CW-1 stated that when he heard about the media interviews where

Defendant Rawlinson claimed a large rollout of vehicles in the first half of 2021, CW-1 "knew it wasn't going to happen." CW-1 also stated that he attended weekly or bi-weekly meetings run by Hasenkamp and attended by Tasker, Watson, and Director of Global Logistics, Greg Henninger. CW-1 recounted how the Company's inability to meet the publicly touted production schedule was openly discussed at these meetings. CW-1 further stated that the timeline for the SOP was tracked by the production schedule, which was used across the Company, including within the logistics team and production team. CW-1 added that, during his tenure at the Company, the entire work force knew that the Company would not meet its production goals as touted by Defendant Rawlinson in media appearances.

94.     CW-1 stated how the Company was behind schedule, running low on funding, and concerned about the ability to even make payroll and purchase equipment. CW-1 stated that during his time with the Company, the facility was never capable of actually producing vehicles. CW-1 stated that the Company experienced significant production delays and material shortages, and the Company was way behind its vehicle production schedule. CW-1 also stated that, at one point in time, the production schedule reflected a SOP date of April 2021, but that this date was moved to October 2021, because of the many ways that the Company could not meet its earlier targets.

95.     CW-1 also stated that the Company lacked a functioning inventory tracking system. CW-1 recalled how employees often wandered around the facility for hours or even days looking for parts that they could not identify properly. CW-1 also stated that the Company resorted to purchasing some parts from rival Tesla Motors while also using parts from Mercedes as well. CW-1 also reported that the car displayed at the Casa Grande launch event was constructed by hand in California. This meant the vehicle was not even constructed at the facility in Arizona.

96.     CW-1 stated how the facility was nowhere near operational and that management was nervous about an upcoming planned in-person visit by the Saudis and

was relieved when the visit was moved to Zoom.  CW-1 stated how his team spent weeks importing vehicles in different stages of production from California to the Tempe, Arizona facility along with racks, parts, and materials, and that the Company staged a production where workers made it look like they were assembling vehicles, which were in fact non-operational, and that this video was shown to the Saudi Investors for the Zoom meeting.  CW-1 stated that upon completion of the production, he and his team spent two days disassembling the phony production line and returning all the parts to their original facilities.

97.    CW-1 stated how even after the Casa Grande facility was supposed to be operational, the Company could not gain approval for the fire suppression system from the local Fire Marshall.

98.    CW-1 stated that the Company rented a body shop in a run-down neighborhood of Casa Grande and shipped unmarked vehicles there for assembly.  CW-1 recalled entering the body shop the day after assembly commenced to find a Company senior manager arguing with the auto body shop proprietor.  CW-1 explained that the proprietor demanded more money once he realized that the Company did not want anyone to know about its covert body shop production.  CW-1 stated that Lucid used the small body shop for production for approximately two months and built six cars there, until the Fire Marshall permitted the Company to use the Casa Grande facility, which was still not fully functional.  CW-1 added that the Fire Marshall also shut down the other Casa Grande power-train facility, where some components were being assembled. CW-1 stated that when he resigned from the Company the power-train facility was still not operational.

99.    CW-1 stated that Defendant Rawlinson's claims to the media did not align with the discussions during the internal meetings.  For instance, CW-1 stated that he and his colleagues laughed when Defendant Rawlinson bragged about a rollout of 6,000 vehicles in the first half of 2021 to the media because "we were just in a meeting where

we said we couldn't go into production."  CW-1 also stated that during these meetings, participants discussed raw materials and parts shortages, crash tests that were behind schedule, production facility delays, construction delays, the need to outsource parts and labor, and other issues.  CW-1 stated that the publicly stated goal of 6,000 cars in 2021 was unrealistic and there was "no way" that it could be met.  According to CW-1, "we all knew" that the Company would not meet its 2021 production goals.  CW-1 relayed that he participated in internal Zoom meetings with Defendant Rawlinson at least once a month where the production delays were discussed.

100.    According to CW-1, in addition to the weekly logistics meetings that he attended, Defendant Rawlinson hosted weekly all-hands meetings (via Zoom), and that there was no way Defendant Rawlinson did not know about the production delays.  CW-1 also stated that Hasenkamp reported directly to Defendant Rawlinson and attended the weekly logistics meetings, where the delays were frequently discussed.  According to CW-1, Defendant Rawlinson, and the rest of senior management, "absolutely knew" they were behind schedule and this fact was openly discussed at the weekly meetings. CW-1 recalled that battery delays were discussed during those meetings. CW-1 stated that Defendant Rawlinson and Hasenkamp took part in multiple walk-throughs of the Casa Grande facility.

101.    CW-2 was a Senior Engineer at Lucid Motors from January 2020 to April 2021.  CW-2 reported to Wulfer de Bruijn, Senior Technical Specialist Efficiency and Systems, and Emad Dlala, who was a Technical Fellow and Senior Staff Engineer.  De Bruijn reported to Dlala, and Dlala reported to Defendant Rawlinson.  CW-2 was a test engineer at the Company who conducted driving tests on prototypes of the Lucid car and later a "production representative" of the car.

102.    As part of CW-2's responsibilities for obtaining the required EPA homologation tests and certifications for the Monroney label, CW-2 prepared a highly detailed time schedule to complete the work.  CW-2 stated that this schedule "was a

Gantt chart," which has several rows that each reflect a task that needs to be done as part of the process with a start and finish date for each task.  CW-2 stated that he had this entire schedule built out for the cars that his team would be testing and preparing for the official EPA tests.  CW-2 stated that the schedule depended on other factors falling into place, including the delivery date of the cars so he could begin testing them. CW-2 stated that he updated the schedule on a weekly, daily, and even an hourly basis, which could alter the completion date.  CW-2 stated that by about January and February 2021, his schedule showed that the Company would not be able to complete the EPA homologation testing and obtain the EPA's certification required for the Monroney label before the end of June.

103.    CW-2 stated he provided his schedule to his boss Wulfer de Bruijn, Senior Technical Specialist Efficiency and Systems and that Emad Dlala, Technical Fellow and Senior Staff Engineer, was also aware of the schedule. CW-2 stated that "a lot of people" had access to his schedule and that Technical Fellow and Staff Engineer Emad Dlala asked him to create a "boiled down" version of the schedule for Defendant Rawlinson.

104.    CW-2 stated that in January and February 2021, he still only had prototypes of the car to test, which was, at that point, the Beta 2 version.  CW-2 stated that these prototypes were built by hand in Newark, CA – not at the Arizona production facility. CW-2 stated that both the Beta-1 and Beta-2 were built in Newark, California and not at the Arizona production facility.

105.    CW-2 stated that in January and February 2021, he did not have what he called "production representative" cars from the Arizona factory, which were cars produced by the production line and which were basically the cars that would be sold to the public.  CW-2 stated that he could not start the final preparations for the official EPA homologation tests and certifications required by federal law until he had the production representative cars on which to run the tests.  CW-2 stated that did not receive his three

production representative cars until early-to-mid-March 2021, which all added significant quality problems. CW-2 stated that "[a]ll three of them were terrible," and "[t]he quality was unsellable. The quality was horrible." CW-2 stated that before he could run his own pre-tests on the cars, his team of technicians had to do major work to make the cars capable of being tested accurately. CW-2 stated that he "had a team of technicians that went through the entire car to make it more production representative," adding that the body panels were not aligned at all and window seals were not sealing. CW-2 further added that the first cars he received had to be completely rebuilt and that, as one example of problems with the cars, the very first car was 8-millimeters too wide.

106. CW-4 was employed as a Senior Technical Program Manager (vehicle testing) at Lucid Motors from September 2020 to September 2021. CW-4 reported to Marvin Riley, Engineering Manager – Vehicle Testing, and Roger Evans, Senior Director Vehicle Development. Riley reported to Evans, who in turn reported to Eric Bach, SVP and Chief Engineer, and Bach reported to Defendant Rawlinson. CW-4 worked out of Lucid's Newark, CA, headquarters and was also out in the field at testing facilities. CW-4 occasionally visited the Company's Arizona manufacturing facility.

107. In regard to the Company's claims that it would deliver its first cars in the Spring 2021 and produce 6,000 cars in 2021, CW-4 stated that he and all of his co-workers knew it was impossible and could not happen, adding "there was just no way." CW-4 stated that "I just knew there was no way they would do 6,000 cars in 2021," and that "the car wasn't ready. It wasn't even close." CW-4 stated that everyone knew these claims were impossible. When asked if Defendant Rawlinson was told by his employees prior to February 22, 2021, that it would be impossible to deliver the first cars in Spring and make 6,000 cars in 2021, CW-4 said yes. CW-4 said that he was on calls where Defendant Rawlinson was told – prior to February 22, 2021 – that it would be impossible to deliver the first cars in Spring and make 6,000 cars in 2021 – "we said there was no way." CW-4 reiterated that the Company's leadership "absolutely" knew,

1   prior to announcing the merger on February 22, 2021, that delivering cars by Spring and

2   producing 6,000 cars in 2021 was not possible.

3       108.   CW-4 stated information was relayed to top leadership during meetings, in

4   reports, and on projection charts that showed that obviously the Spring SOP would not

5   be possible.  These reports included "supplier projections, tooling projections, software

6   projection – none of that would line up" with hitting a Spring SOP.  CW-4 stated that

7   "The dates wouldn't box with the Spring SOP date."  CW-4 added that achieving the

8   Spring SOP was "not even close" and that it was "just impossible."  CW-4 stated that the

9   plant "could not even" produce the correct battery and electric motor by that time, and

10  that the motor "was not fully validated" since it was still going through "design

11  changes." CW-4 stated that "everything was lining up with late December 2021 or early

12  2022" in terms of a "real SOP where you deliver a car to customers."

13      109.   When asked whether this timeline was communicated to Defendant

14  Rawlinson, CW- 4 stated: "oh god yeah.  He knew what was going on."  CW-4 added

15  that Peter Hasenkamp, VP of Global Supply Chain and Operations, and Peter

16  Hochholdinger, VP of Global Manufacturing reported to top management, including

17  Defendant Rawlinson, that the Company would not meet a Spring SOP.  CW-4 stated

18  that he sat in meetings with both Hasenkamp and Hochholdinger when the conversations

19  concerning the unreachable Spring SOP took place.  CW-4 stated that Vice President of

20  Software, Electronics, UX and IT Vince Nakayama was also present in those meetings,

21  as were others.

22      110.   CW-4 stated that "If they would have said, '[Delivery by] March of 2022,'

23  no one would blink.  We'd have to push for that, but it could happen."  CW-4 stated that

24  Spring 2021 for delivery and 6,000 cars in 2021 was impossible.

25      111.   CW-4 stated that "There were a whole bunch of systems that no way they

26  could meet the Spring SOP date."  CW-4 stated that in January and February 2021, the

27  Company was still working with the Beta 2 version of the car and that "The Beta 2s

28

were so far away from the production [version] it just wasn't feasible, the tooling, the production, it was so far away." Cw-4 stated that the Beta-2s "did not even have a working motor and battery combination" at that time and by February 2021, the "Beta-2 cars did not even have real interiors. They didn't have doors, door handles—any of that stuff."

112.   CW-4 stated that in January and February 2021, the Company engineers were still working on developing the car that would ultimately be produced and many decisions had not yet been made. CW-4 stated that the motor and configurations were changing at the time and that "some of the internals of the motors were changing." CW-4 stated that at the time, engineers had not even decided on what battery pack to use in the car.

113.   CW-5 was formerly employed by Lucid Motors from August 2020 to mid-December 2020, in the General Assembly Department at the Company's Casa Grande, Arizona plant.

114.   CW-5 stated that "50%" of the plant's equipment was not complete. CW-5 stated that by the time his tenure ended in December 2020, that the plant would take 4 or 5 months for construction to be complete. When asked if he believed the Company could begin production in Spring 2021, CW-5 stated that he did not believe that Lucid would be able to start production in Spring 2021, adding that "the managers knew this" as well.

115.   CW-6 was formerly employed by the Company from Fall 2020, to Summer 2021 at the Company's plant in Casa Grande, Arizona as a member of the Electrical Maintenance Team. CW-6 worked as part of the Company's maintenance team in the General Assembly area and his responsibilities included maintaining the tools and equipment used in assembling the Company's cars, including the Air. CW-6 stated that he reported to General Assembly Maintenance Supervisor Jeremiah Johnson, who in turn reported to maintenance supervisor Donald Waldman, who in turn reported to the

General Manager of the plant.

116.   CW-6 stated that there were monthly Company-wide "all-hands" video conference calls that upper management from the Company's headquarters participated in, and that during these calls, the delays were frequently discussed and that these delays would impact the Company's SOP date. CW-6 stated that the SOP date had been repeatedly pushed out throughout his tenure and recalled that as of "January or February" 2021, and before the merger with Churchill was formally announced, the SOP date had been pushed from its earlier Spring 2021 date to October 2021.

117.   CW-6 stated that issues with the supply of materials and parts that the Company needed for production had contributed to the delays.  CW-6 stated that testing showed that certain parts needed to be reworked or reengineered.  CW-6 stated that by the time he left the Company, the General Assembly department was still unfinished, and he and his colleagues were identifying problems with parts.  CW-6 stated that in General Assembly, things were still not commissioned and approved by the time his tenure ended.

118.   CW-7 worked for Lucid Motors from January 2021 until at least the Summer of 2021.  CW-7 worked at the Newark, CA, facility.  CW-7's job involved testing the Lucid Air's electric motor and drivetrain, which are essentially a combined part for the electric vehicle.

119.   CW-7 stated that the Alpha and Beta motors that were being worked on in February through late Spring-to-early Summer were being hand built at the Newark, CA facility. CW-7 stated that when he started at Lucid Motors in January 2021, the Company was still working on and testing the "Alpha" version of the motor.  At the time, this motor was not yet at the point where it was ready for production in a deliverable vehicle. CW-7 stated that in February 2021, he began working on the next versions of the motor, "Beta 1."  At that time, in February, the Beta 1 motor was "still not 100 percent there."  The next version, "Beta 2" was ready sometime in mid-March to

1   April 2021.  CW-7 explained that a production-ready version of the motor was not ready
2   until about July 2021.

3       120.   CW-7 stated that in February 2021 and continuing during the months that
4   followed, the Company was still in the process of finding new suppliers for parts that
5   would be ultimately used to assemble the car at the Casa Grande, Arizona facility.

6       121.   CW-7 stated that, as of February 2021, he would not have thought it
7   possible to make 6,000 cars by the end of the year.  CW-7 stated that in February 2021,
8   when the Company claimed it could deliver its first cars in the spring and make 6,000
9   cars by the end of the year, the Company's factory in Casa Grande, Arizona was not yet
10  capable of producing motors for the car.  CW-7 stated that the Arizona line did not start
11  producing motors for his team to start testing until late spring or early Summer 2021.

12      **D.**    **The Merger Is Announced**

13      122.   On February 22, 2021, the Company's official Twitter account posted an
14  announcement that Defendant Lucid and Churchill had entered into a definitive merger
15  agreement, whereby Churchill would acquire the Company.  The tweet linked to a press
16  release reporting some of the terms of the Merger.  The official announcement of the
17  merger led <u>Barrons</u> to publish (on February 23, 2021) that "the worst kept secret on Wall
18  Street is finally official," reporting on the confirmation of the widely held understanding
19  among investors that Churchill had been planning to acquire the Company.

20      123.   To close, the merger required approval by a majority of shares voting on it.
21  Upon the close, Air Merger Sub, Inc., a subsidiary of Churchill ("Merger Sub"), would
22  merge into the Company, with the Company being the surviving entity of the Merger.

23      124.   Concurrently with the close, Churchill would sell approximately 166.6
24  million additional shares of Churchill stock at a price of $15.00 per share. This
25  additional stock sale is referred to as the "PIPE Investment," which refers to "private
26  investment in public equity," because these newly issued shares were privately placed
27  with sophisticated investors, rather than sold publicly.

28

125.   At the time of the merger, Churchill was expected to hold approximately $2.07 billion in cash (*i.e.*, not counting PIPE Investment proceeds), assuming no Churchill shares were redeemed.  Thus, along with the PIPE Investment proceeds, the post-merger business would have approximately $4.4 billion in capital after $168 million in transaction expenses.  At the time of the merger's announcement, the Company had no cash.

126.   Following the merger, Churchill's pre-merger shareholders were diluted as Churchill issued additional shares through the merger.

127.   The merger would provide the Company with an enormous influx of capital to continue its operations, as it would give the Company access to Churchill's pre-merger cash of $2.1 billion and an additional $2.5 billion in financing through the PIPE Investment.  Going public also offered the Company an easy access to additional capital through the sale of shares publicly.

128.   On February 22, 2021, the Company issued a press release with certain information about the merger.  That press release referenced the Investor Presentation that the Company posted to its Investor Relations page on its website.  The press release and Investor Presentation slide deck, along with other merger documents, were also filed with the SEC the evening of February 22, 2021.

129.   The Investor Presentation slide deck included a slide, which disclosed to the market that the Company would not be producing 6,000-7,000 Airs as it had previously promised, but instead, a measly 577 Airs.  Even with the conservative assumptions that (i) the Company would only have previously achieved the bottom of this range (6,000) cars, and (ii) that each of these cars would be sold at the lowest end of the price range the Company was marketing ($69,900), this change reflected an incredible $380 million decrease in 2021 revenue (*i.e.*, a reduction of about 91%).  Furthermore, this decrease strongly demonstrated that the Company was not in a position to begin production of the vehicle at scale – contrary to its previous assurances that the factory was "already built,"

1 "fully commissioned," and "good for 34,000" units of the Air per year.

2 130. In addition, in the Investor Presentation slide deck, the Company also

3 disclosed that production would not begin in the Spring of 2021, as had previously been

4 claimed, but rather, ***not until the second half of 2021***. The relevant slide showing this

5 delay in production is shown below:



6
7
8
9
10
11
12
13
14
15
16
17

18 131. During the Investor Presentation, Defendant Rawlinson claimed the delay

19 to the need to improve the quality of the Lucid Air, stating they were "only going to start

20 production when we get that quality spot on." This meant the Casa Grande factory

21 could not have previously been "already built," since completion of the factory would

22 have required that each aspect of the production process/equipment was built to

23 specification, validated at that specification, and ready to actually begin producing the

24 vehicle, or SOP, which was not the case.

25 132. On February 23, 2021, Defendant Rawlinson was interviewed by Jim

26 Cramer and David Faber on CNBC. During the interview, Defendant Rawlinson

27 disclosed that, in recognition that manufacturing an electric car on a mass scale is a

28 difficult endeavor, they must "humbly" work and "diligently execute" in order to get the

car "into production."  These statements revealed that far from being in a position to switch on the "already built" and "fully commissioned" Arizona factory to begin producing 6,000 cars in Spring 2021, the Company still carried significant risks and challenges in getting to a position where they could begin production. Defendant Rawlinson also noted the magnitude of getting the "first product into production," referring to it as the "great litmus" test.

133.   On February 23, 2021, the Company and Churchill representatives held a call regarding the merger ("Merger Call"), where Defendant Rawlinson reiterated that they were still only "building the pre-production cars" at the Casa Grande plant, and that the cars will only be fully produced when the quality is "right."

134.   On February 23, 2021, Defendant Rawlinson was interviewed by Ed Ludlow of Bloomberg Television.  Mr. Ludlow asked: "You've delayed production until the second half of 2021. You said it would – deliveries of Lucid Air would start in the Spring. What's behind that delay?"  Defendant Rawlinson stated that the deal with Churchill had "freed" him from that need to work to the artificial construct of a specific date.  Defendant Rawlinson also disclosed that the Company was still "chasing down a number of supplies from around the world."

135.   On news that the Company was being taken public through Churchill, that it would only produce 577 Airs in 2021, and that it would not begin production until the second half of the year, Churchill's stock price dropped.  Churchill's stock price fell from a close price of $57.37 on February 22, 2021, to a close price of $35.21 on February 23, 2021.  This was a decline of 38.63% and resulted in Churchill losing $5.7 billion in market capitalization.  Churchill's stock again plummeted for a second day from a close price of $35.21 on February 23, 2021, to a close price of $28.70 on February 24, 2021.  This was a decline of 18.49% and resulted in Churchill losing $1.69 billion in market capitalization.  Altogether, Churchill's stock price fell 49.9% from February 22, 2021 to February 24, 2021, wiping out $7.4 billion in market capitalization.

136.   On February 23, 2021, Defendant Rawlinson stated on CNBC that the post-merger entity's valuation would be a reflection of the Company's technology. Churchill's stock price fell so dramatically given the revelations that the Company was unprepared to meet its touted production numbers and schedule (*i.e.*, 6,000 Airs and a Spring SOP).

137.   The financial press was highly critical of the news and Churchill's stock price decrease.  For instance:

(a)   On February 23, 2021, Bloomberg published an article by Ed Ludlow stating that Churchill's shares "fell as much as 46% on Tuesday" and noting the "production delay" as a cause for investor "disappoint[ment]."  The article explained that "Lucid had previously said deliveries of its debut EV, a luxury sedan called the Air, would begin in the second quarter" but that now the "company has now decided not to commit to a start date."

(b)   On February 23, 2021, Reuters published an article reporting that "Lucid Motors' first electric car, the luxury Air, won't go in production now until late 2021, later than the Spring 2021 launch initially planned."

(c)   On February 23, 2021, the Financial Times published an article noting that Churchill "shares crashed into the low $30's" upon the Merger announcement, noting that Lucid's "cars will not even come off its assembly line in the Arizona desert until later this year."

(d)   On February 23, 2021, Reuters published an article stating that Churchill's stock price had fallen by as much as 40% and reporting that "Lucid's first electric car, the luxury Air, won't go in production now until late 2021, later than the Spring 2021 launch initially planned."

(e)   On February 24, 2021, CNBC issued an article entitled "Lucid Motors 'humbly' embarks on the difficult task of mass producing its electric cars, CEO says," which reported on the significant price decline Churchill experienced,

noting "Deliveries of Lucid's first car, the all-electric Air, are now set for the second half of this year, a delay from its earlier forecast."

(f)     On February 25, 2021, automotive industry publication Electrek, issued an article focusing on the disclosure that production of the Air would be delayed, in an article entitled: "Lucid Motors pushes back first Air deliveries to second half of 2021."

138.   On July 23, 2021, the Company announced the completion of the merger. However, the merger was supposed to close the prior day, on July 22, 2021, but not enough shareholders had approved the proposal—causing Churchill to extend the deadline to July 23, 2021.  Once the merger was completed, the Company confirmed that Defendant Rawlinson would continue as CEO.

139.   The Company did not begin production until September 28, 2021, and the first Lucid Airs were not delivered to their customers until October 30, 2021.

140.   On December 6, 2021, the Company filed a Form 8-K with the SEC disclosing that it had received a subpoena from the SEC on December 3, 2021, requesting the production of certain documents related to an investigation by the SEC and stated that "the investigation appears to concern the business combination between [CCIV and Lucid] and certain projections and statements."  The Company reported that it "is cooperating fully with the SEC in its review."

141.   On December 6, 2021, a publicly filed Form 4 revealed that Defendant Rawlinson sold 466,749 shares of Lucid stock at $47.27, while the Company was in possession of the SEC subpoena, but before the public knew, meaning that he sold stock (worth over $22 million) immediately before the Company disclosed it was undergoing an SEC investigation.  When the Company disclosed the investigation, the Company's stock price plummeted, opening on December 6, 2021, at $40.02, a 15.34% decline. Major publications, such as CNN, the New York Post, and CNBC, were critical of the Company, drawing comparisons between the Company and Nikola and Lordstown.

142.   On December 8, 2021, the Company issued a press release reporting "its intention to offer, subject to market and other conditions, $1,750,000,000 aggregate principal amount of convertible senior notes due 2026." This need for funding came much sooner than Defendant Rawlinson had originally forecasted, when he stated that the latest round of funding (*i.e.*, received in the merger) "sees us through to the end of 2022." Indeed, the Company disclosed that it intends to allocate the net proceeds of the offering to "new or existing 'Eligible Green Investments,' including the development, manufacture, or distribution of products, key components, and machinery related to electric vehicles or energy storage systems, . . . Pending such allocation, Lucid intends to use the net proceeds of the offering for business expansion and general corporate purposes, which may include investing in our manufacturing capabilities, expanding and improving operations such as our retail and service network, investing in research and development, and supporting other potential growth opportunities."

143.   The market reacted strongly to this negative news that the Company required additional funding. The Company's stock price fell substantially from a close of $44.72 on December 8, 2021, to a close of $36.52 on December 9, 2021, a decrease of 18.33%.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

144.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

145.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

146.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants'

wrongful course of conduct alleged herein.  Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

147.   During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

148.   The Company Board is currently comprised of Defendants August, Liveris, Posawatz, and Rawlinson (the "Director-Defendants") and non-parties Turqi Alnowaiser ("Alnowaiser"), Nancy Gioia ("Gioia"), Frank Lindenberg ("Lindenberg"), Nichelle Maynard-Elliot ("Maynard-Elliot"), and Janet S. Wong ("Wong") (collectively with the Director-Defendants, the "Directors").  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

149.   Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

150.   Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

151.   Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed

elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

152.   Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

153.   Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

154.   Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  They are in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

155.   Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Individual Defendants Are Not Independent or Disinterested**

**Non-Party Alnowaiser**

156.   Non-party Alnowaiser is the Deputy Governor and Head of the International Investments Division at the PIF of the Kingdom of Saudi Arabia.  Mr. Alnowaiser previously served at the PIF as Head of International Investments and as Senior Advisor.  Mr. Alnowaiser also served in executive roles at Saudi Fransi Capital.

Mr. Alnowaiser served as a member of Atieva's board of directors from April 2019 until the Merger, after which he continued to serve as a director of the Company.  Mr. Alnowaiser has shared voting power with respect to Ayar Third Investment Company ("Ayar"), an affiliate of PIF, which was the majority shareholder of Atieva and which, as of July 23, 2021, owned 62.7% of the Company's common stock.  Thus, Mr. Alnowaiser had substantial control of Atieva during the period when the Individual Defendants made or caused Atieva to make false and misleading statements.

**Non-Party Gioia**

157.   Non-Party Gioia became a Company Board member in July 2021.  Ms. Gioia was a consultant to Churchill in evaluating the transactions contemplated by the agreement to merge in July 2021.  Ms. Gioia also has an economic interest in shares of Churchill's common stock and warrants.  Due to Ms. Gioia's involvement as a consultant on the merger and due to the compensation Ms. Gioia received for her appointment and service on the Company Board, demand upon her is futile and, therefore, excused.

**Defendant August**

158.   Defendant August has an economic interest in shares of the Company's common stock and certain warrants through his control and partial ownership of an entity called OHA Partner Global Co-Investment III, LLP, which owns membership interests in Churchill Sponsor IV LLC ("Sponsor").

159.   Defendant August disregarded his duties to monitor Churchill's internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

**Defendant Liveris**

160.   Defendant Liveris served as a director and Chairman of Atieva until the merger, after which he served as a Company director and as Chairman of the Board. Further, Defendant Liveris was an operating partner of Churchill Sponsor IV LLC.

Thus, Defendant Liveris served as a link between Atieva and Sponsor, and therefore Churchill. Defendant Liveris also has economic interest in shares of the Company's common stock through his ownership of membership interests in the Sponsor, which beneficially owned 5.9% of the Company's common stock as of July 23, 2021.

**Defendant Posawatz**

161. Defendant Posawatz served as a member of Atieva's board of directors until the merger, after which he has served as a member of the Company's Board. Defendant Posawatz also served on a special committee of Atieva that considered whether to pursue the Merger Agreement and merger. Defendant Posawatz also has a substantial economic interest in shares of the Company's common stock through his ownership of membership interests in the Sponsor, which beneficially owned 5.9% of the Company's common stock as of July 23, 2021.

**Defendant Rawlinson**

162. Defendant Rawlinson served as CEO and CTO of Atieva and continues to serve in those positions at the Company. Thus, Defendant Rawlinson is a non-independent director. Defendant Rawlinson issued false and misleading statements to the effect that production and customer deliveries of the Lucid Air would begin in spring 2021, and that Atieva expected to produce 6,000-7,000 vehicles in 2021.

**Additional Reasons That Demand On The Board Is Futile**

163. The Directors have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Liveris served at both Atieva, as a director, and Churchill, as an Operating Partner. Thus, Defendant Liveris was a colleague of Defendant August during the time when he was breaching his fiduciary duties, and as a director of Atieva and an Operating Partner at Churchill.

164. Defendant August and Ms. Gioia both held membership interests in

1    Sponsor, which beneficially owned 5.9% of the Company's common stock as of July 23,

2    2021. Therefore, they together have substantial economic interests in Churchill due to

3    Sponsor's interest in Churchill.

4         165.    Defendant August served as a member of Churchill's Audit Committee.

5    Pursuant to the Churchill's Audit Committee Charter, Defendant August was responsible

6    for, *inter alia*, overseeing the accounting and financial reporting processes of Churchill

7    and reviewing and taking steps to remedy any deficiencies with Curchill's system of

8    internal controls.

9                    **FIRST CAUSE OF ACTION**

10    **(Against The Individual Defendants for Breach of Fiduciary Duties)**

11         166.    Plaintiff incorporates by reference and re-alleges each and every allegation

12    contained above, as though fully set forth herein.

13         167.    The Individual Defendants owe the Company fiduciary obligations.  By

14    reason of their fiduciary relationships, the Individual Defendants owed and owe the

15    Company the highest obligation of good faith, fair dealing, loyalty, and due care.

16         168.    The Individual Defendants violated and breached their fiduciary duties of

17    care, loyalty, reasonable inquiry, and good faith.

18         169.    The Individual Defendants engaged in a sustained and systematic failure to

19    properly exercise their fiduciary duties.  Among other things, the Individual Defendants

20    breached their fiduciary duties of loyalty and good faith by allowing the Company to

21    improperly misrepresent the Company's publicly reported financials.  These actions

22    could not have been a good faith exercise of prudent business judgment to protect and

23    promote the Company's corporate interests.

24         170.    As a direct and proximate result of the Individual Defendants' failure to

25    perform their fiduciary obligations, the Company has sustained significant damages.  As

26    a result of the misconduct alleged herein, the Individual Defendants are liable to the

27    Company.

28

171.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Individual Defendants for Gross Mismanagement)

172.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

173.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

174.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

175.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against The Individual Defendants for Abuse of Control)

176.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

178.   As a direct and proximate result of the Individual Defendants' abuse of

control, the Company has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179.   The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

## FOURTH CAUSE OF ACTION

### (<u>Against The Individual Defendants For Unjust Enrichment</u>)

180.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.   During the Relevant Period, the Individual Defendants received bonuses, stock options, and/or similar such compensation from the Company that were tied to the financial performance of the Company.  The Individual Defendants were unjustly enriched thereby.

182.   To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge their unjustly obtained bonuses and compensation.

183.   The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

## FIFTH CAUSE OF ACTION

### (Against Defendant Rawlinson for Contribution <br> <u>Under Sections 10(b) and 21D of the Exchange Act</u>)

184.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.   Atieva and Defendant Rawlinson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Rawlinson's willful and/or reckless violations of his obligations as an officer of Atieva.

186.   Defendant Rawlinson because of his position of control and authority as CEO of Atieva, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Atieva, including the wrongful acts complained of herein and in the Securities Class Action.

187.   Accordingly, Defendants Rawlinson is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

188.   As such, Lucid is entitled to receive all appropriate contribution or indemnification from Defendant Rawlinson.

## SIXTH CAUSE OF ACTION

### (Against the Atieva Defendants for Aiding and Abetting Breach of Fiduciary Duty)

189.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.   The Atieva Defendants aided and abetted Defendant August who breached his fiduciary duties to Churchill.

191.   The Atieva Defendants' misconduct resulted in continuous, connected, and ongoing harm to Churchill.

192.   The Atieva Defendants controlled Atieva, the Company's functional and operational predecessor, and made or caused Atieva to make statements and issue press

releases that contained materially false and misleading statements promoting Atieva's business, operations, and prospects, particularly as related to production and customer deliveries of the Lucid Air. Specifically, the Atieva Defendants made or caused Atieva to make false and misleading statements touting that production and customer deliveries of the Lucid Air would begin in spring 2021. This misconduct aided and abetted Defendant August's breaches of duty alleged herein.

193. As a direct and proximate result of the Atieva Defendants' aiding and abetting of Defendant August's breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

194. Plaintiff on behalf of the Company has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

1

## JURY DEMAND

2      Plaintiff demands a trial by jury on all issues so triable.

3 Dated: February 23, 2022

4

5                          Respectfully submitted,

6                          **MAGNANIMO DEAN LAW, APC**

7                          By: _Lauren Dean_____

8                             Lauren Dean, Esq.

9                          5850 Canoga Avenue, Suite 400
                           Woodland Hills, CA 91367

10                         Tel: (818) 305-3450

11                         Email: lauren@magdeanlaw.com

12                         Gregory M. Egleston
                           **GAINEY McKENNA & EGESTON**

13                         501 Fifth Avenue, 19th Floor
                           New York, NY 10017

14                         Phone: (212) 983-1300
                           Fax: (212) 983-0383

15                         Email: gegleston@gme-aw.com

16                         *Counsel for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

{Client Files-NEW/LUCI01/001/PLD/00099381.DOC}                    50

1

## **VERIFICATION**

2

3      I, ZSATA WILLIAMS-SPINKS, declare that I have reviewed the Verified

4  Shareholder Derivative Complaint ("Complaint") prepared on behalf of Lucid

5  Group, Inc. and authorize its filing.  I have reviewed the allegations made in the

6  Complaint, and to those allegations of which I have personal knowledge, I believe

7  those allegations to be true.  As to those allegations of which I do not have personal

8  knowledge, I rely on my counsel and their investigation and for that reason believe

9  them to be true.  I further declare that I am a current holder, and have been a holder,

10  of Lucid Group, Inc. common stock at all relevant times.

11  Date: February  2  , 2022

12

13                                                                _____

14                                                                ZSATA WILLIAMS-SPINKS

15

16

17

18

19

20

21

22

23

24

25

26

27

28